HUNT *v.* HAVEN. { Aug. 13, 1875.

*Latent ambiguity—Deed—Declarations as to ownership—Character of occupation.*

February 28, 1842, A mortgaged to B "all the farm in said H. lying on both sides of Ladd street, so called, on which I now live and which I now carry on, estimated at 150 acres, more or less." September 4, 1844, A mortgaged to B "all the farm in said H., lying on both sides of Ladd street, so called, which I now live on, estimated at 150 acres, more or less, * * being the same land described in my mortgage deed to said B, dated February 28, 1842, and recorded in Grafton Registry, lib. 168, fol. 136." B claimed that the Ladd farm and the Ward farm adjoining passed by the above description. June 9, 1843, A conveyed the Ladd farm to C. From 1840 to September, 1844, and subsequently, C resided upon the Ladd farm and A upon the Ward farm. C's grantees brought an action against B's administrators to recover the Ladd farm, claiming that A neither lived upon nor occupied the premises in February, 1842, nor in September, 1844. *Held,* that the declarations of C, made prior to September 4, 1844, that he claimed to own the premises, were admissible, as tending to show that he was occupying them on his own account, and not as agent or tenant under A. *Held,* also, that the declarations of A, made prior to September 4, 1844 (he having been deceased), that he did not own the Ladd farm, but that it belonged to C, were admissible as tending to show that the latter was occupying for himself and not on account of the former; and, being the declarations of a deceased person, under whom the defendants derive their title to the premises in dispute, respecting the boundaries of the land described in the mortgages, are admissible against the defendants claiming under A.

Declarations of A and C, subsequent to February 28, 1842, and prior to September 4, 1844, as to the ownership of the premises in dispute, also *held* admissible, if the jury should find that B, when he took the mortgage of 1844, had notice of the deed from A to C, of June, 1843; also *held* admissible to rebut evidence introduced by the defendants as to the character of the occupation of the premises by A and C. Evidence that the premises were taxed to C in 1841, 1842, and 1843, *held* admissible, as tending to show the character of his occupation of the premises.

The jury were instructed that the record of the deed from A to C was not conclusive evidence of notice to B of the existence of such a deed, but that they might consider it in connection with all the facts in the case, upon the question whether B, in fact, knew of its existence when he took the mortgage of 1844. *Held,* that the instructions were correct.

A verdict will not be set aside because the court permitted the party calling a witness to put leading interrogatories. It is within the discretion of the presiding justice to allow leading questions to be put, and his discretion will not be revised unless that question is reserved for this court.

FROM GRAFTON CIRCUIT COURT.

WRIT OF ENTRY, by William P. Hunt against George W. Haven and Jabez B. Upham, administrators of Joseph Bell, for the recovery of the Ladd farm in Haverhill.* Writ dated Sept. 3, 1870.

The plaintiff put in evidence. (1) Mortgage, James Woodward to Phineas Spaulding, dated January 4, 1850, to secure note of $2,000 to Spaulding of same date. (2) Assignment of said mortgage by P. Spaulding to the plaintiff and Horace Hunt, dated July 7, 1870. (3) Affidavit, &c., of entry to foreclose same, August 18, 1869. (4) Office copy of quitclaim deed from Mary Hale to James Woodward, dated September 10, 1849—objected to by the defendants as immaterial. (5) Mortgage from James Woodward to Mary Hale, dated June 9, 1843—objected to by the defendants as irrelevant and immaterial. (6) Deed, Joshua Woodward to James Woodward, dated June 9, 1843. (7) Deed, Samuel Ladd to Joshua Woodward, dated November 23, 1840.

All these conveyances covered the Ladd farm.

The plaintiff then rested his case. The defendants introduced a mortgage from Joshua Woodward to Joseph Bell, dated February 28, 1842, conditioned for the payment of two notes—one $1,000, one $700 —wherein the premises conveyed are described as follows : "All the farm in said Haverhill, lying on both sides of Ladd street, so called, on which I now live and which I now carry on, estimated at 150 acres, more or less ; also the Sweatland farm, so called, in said Haverhill,

---

* The question as to the ownership of this farm has been before the court for about twenty-five years. The first suit to recover it was commenced March 17, 1851, and was entered at the April term, 1851. Besides jury trials, the case has been before the law term in a variety of forms. The reported decisions are,—*Bell* v. *Woodward*, 32 N. H. 64; S. C., 34 N. H. 90, 42 N. H. 181, 46 N. H. 315, 47 N. H. 539, 48 N. H. 437, *ib.* 444; also, *Hunt* v. *Haven*, 52 N. H. 162. Besides these, there are one or more important decisions which have never been reported.

In *Bell* v. *Woodward*, 48 N. H. 439, 440, Chief Justice PERLEY, after giving a brief history of this litigation, says,—"It certainly would not be creditable to the administration of the law in this state, if, after these repeated trials of fact by the jury, and so much examination by the court of the law raised at different times in the cause, it should be now discovered that all that has hitherto been done towards settling the rights of these parties must go for nothing; and after blundering about for ten years, we should be obliged to retrace our steps and take a fresh start in a new career of litigation."

Whether creditable or not, the litigation has been going on nearly seven years since this opinion was penned by that distinguished jurist. Whether "a fresh start" will be taken or not, remains to be seen.                           REPORTER.

being all the 100 acre lot, No. 11, west of the road through the same, in the first division of 100 acre lots in said Haverhill."

The defendants also introduced the deposition of Lyman Buck, who testified as to the manner in which the Ladd farm was carried on after March 4, 1842, and then rested their case. It appeared that at the time of the purchase of the Ladd farm by Joshua Woodward, in 1840, he was the owner of the Ward farm on which were the house and buildings occupied by him and his family; and that the Ladd farm and the Ward farm lay side by side. In the course the trial took, the only question finally submitted to the jury was, whether the above mortgage, of February 28, 1842, covered the Ladd farm.

The plaintiff offered the following depositions :

1. *Enoch Wiggin.* Int. 8 and answer were to the effect " that Joshua Woodward told him, in 1840 or 1841, that he had nothing to do about the Ladd farm ; that he did not own it; that it belonged to James ;" the plaintiff not admitting, but on the contrary denying, that Joshua was in possession of the premises at the time. The answer was read, subject to the defendants' exception.

The answers to Ints. 15, 16, and 17 were as follows: " I heard James say that the Ladd farm belonged to him—that he owned it. This was in the summer of 1841 or 1842. When I hired the place in 1840 or 1841, I met him, and asked him if he was the man that owned the place, and he said he was." Admitted, subject to exception.

2. *Benjamin Warren.* In answer to Int. 26, he testified " that after April 4, 1842, and during the haying season of 1842, Joshua Woodward told me it [the Ladd farm] belonged to James; that he had nothing more to do with it than I had." Admitted, subject to the defendants' exception.

3. *J. B. F. Woodward.* Ints. 11 and 12 were objected to as leading. Ints. 18, 19, 21, 22, 28, and 92 were admitted, subject to exception. The answer to Int. 18 was as follows : " I think my brother Isaiah told me, at the time I spoke to him, to come in with him ; that he hired it [the Ladd house] of James Woodward ;"—said Isaiah was, at the time referred to by the witness, occupying a part of the house on the Ladd farm.

Int. 92, on cross-examination, was as follows :

" What control do you know of James Woodward exercising over the Ladd farm which he did not exercise over the Ward farm, from 1840 to 1845 ? "

*Ans.* " He pretended he owned the Ladd farm, and did not the Ward farm. [He controlled both farms.] I understood he rented the Ward farm and owned the Ladd farm—that is, I heard so. I had no other means of knowing, as I did not see any writing."

The defendants objected at the caption and at the trial to all except the words in brackets as not responsive to the question, and the same was at first excluded ; but after Int. 96 and answer were read, in which the witness stated that he so understood from Joshua Woodward, the whole was admitted.

4. *Eliza Poole's* deposition. Ints. 3, 4, and 5, and answers, as follows:

3. " Please state whether you heard anything said between James Woodward and Joshua Woodward, or in the presence of Joshua, in relation to the purchase of the Ladd farm before or about the time of the purchase, &c."

*Ans.* "I think I must have been there at that time, for I distinctly remember Mr. Ladd's coming from his house over there and talking about selling the farm. I heard the question discussed about the purchase of the farm, and they wished to purchase it for James. James wished to purchase it, if he could raise the money to pay for it. I heard it talked over in the family."

4. " Was anything said, and if anything what, by Joshua and James in relation to obtaining money to pay for the place ? "

*Ans.* "It was decided, I believe, that they should try to raise the money from Mr. Bell, if I remember right."

5. " Was anything said, and if anything what, whom the money should be hired for, and who should go for it ? "

*Ans.* " It was to be hired for James, and Mr. Woodward was to go for it, as he had had business with Mr. Bell, and was acquainted with him : James was a young man."

24. " What knowledge, if any, have you in relation to persons occupying the Ladd house making application to any one for it ? "

*Ans.* "The first application, I think, was from Mr. Wiggin. He went to Mr. Woodward, and he sent him to James, for he said he had nothing to do with it. I heard this said at the time by Mr. Woodward, but *I did not hear the application.*"

25. " During the time you were in Mr. Joshua Woodward's family, as you have before stated, did you hear Joshua say anything, and if anything what, as to the ownership of the Ladd farm ? "

*Ans.* " Time and again I have heard him call it James's farm, and that he had nothing to do with it. He always stated that after he bought it, and never claimed any ownership in it [and I know he hadn't any; but perhaps this last ought not to be put down, as it is a strong expression for me to make]." The above was admitted, subject to exception. With respect to the answer to Int. 25 the ruling was, that the answer was only to be considered by the jury, in case they find that the declarations of Joshua Wooodward were made before the execution of the mortgage to Bell, February 28, 1842. So much of the answer as is included within brackets was taken down at the defendants' request.

5. *Susan Woodward's* deposition. Ints. and answers as follows:

Int. 22. " Please state whether or not you heard anything said between James Woodward and his father who should pay the mortgage to Bell; if so, when was it ?—what was it ? "

*Ans.* " James was to pay the money. The money was to come from James to pay Mr. Bell. I heard this talked between James and his father when he came home and stated how it was."

23. " What, if anything, did you hear said, and by whom, and when, in relation to a horse in connection with the purchase of the Ladd farm ? "

*Ans.* " Mr. Woodward had a horse that Mr. Ladd liked very much, and wanted it ; and James got his father to let Mr. Ladd have the horse and he would pay him for it, and so did ; and Mr. Ladd was to have it. This was talked over in the family after the trade."

24. " Was this talk, referred to in your last answer, before or after Ladd had the horse ? Who were present in the family at the time of the talk ? "

*Ans.* " I don't know who was present in the family. It was talked of before he had the horse. He used to come to see about it very often, and wanted it very much."

25. " Whom was the talk between ? "

*Ans.* " Mr. Woodward and Mr. Ladd. I have heard them talk together about it."

26. " In your answer to Int. 23, you say James got his father to let Mr. Ladd have the horse, and he would pay him for it ;—how did you know this ? "

*Ans.* " I heard them state it."

27. " Whom do you mean by them, in your last answer ? "

*Ans.* " James and Mr. Woodward I heard talking together about it, and he agreed to pay him for the horse."

In her answer to Int. 34, on cross-examination, the witness stated as follows : " I don't know that I was present when James bought the horse."

Int. 35 and answer were as follows :

" Do you know anything beyond the mere fact that Mr. Ladd had a horse belonging to your husband towards the farm, except what you have been told by or heard from others ? "

*Ans.* " Nothing, except what I have heard from James and Mr. Woodward."

Int. 31 and answer, in the same deposition, as follows :

" Please state whether or not you heard your husband, prior to February, 1842, say anything as to the ownership of the Ladd farm, and, if anything, what."

*Ans.* " Why, he didn't own it. He purchased it for James, and James was to own it when he got the money, and he was to pay Mr. Bell. I heard him say that." The above was admitted, subject to exception.

6. *Joshua H. Woodward's* deposition. Int. and answer as follows :

Int. 35. "What personal knowledge, if any, had you of the purchase of the Ladd farm ? "

*Ans.* " * * After Ladd had fixed the price he would take for the place, he got my father to go to Mr. Bell to see if he could borrow the money from him to make the payment. I was with my father when he went to Mr. Bell. Mr. Bell put him off. Mr. Bell, at this time, made objection, which he said he would think of : it was, that

there was another claim against the property that was not to be paid at the time, and the securities would only be against the property, as my brother had nothing, just starting in business. My father told Mr. Bell, at the time, that the property would be purchased by my brother for himself, if purchased; and Mr. Bell remarked that he would think of it, and tell him what he would do, at some short time after. * * The property was purchased shortly after. After the completion of the purchase my brother took possession of the property, and mortgaged it the same as if the property had been deeded to him. * * There was one claim that I recollect to be paid. I think the name was Franklin. The lady's name before marriage was Ladd. Her claim was $200."

Int. 36. "Who were present, if any one, at the time when your father told you what Mr. Bell had said as to the mode of doing the business?"

Ans. "My brother; and I think there were other members of the family present at the time."

Int. 37. "To whom was the conversation addressed?"

Ans. "It was talking to both of us, speaking of the negotiation that was making."

Int. 38. "After your father stated the result of his interview to you and your brother, was any conclusion arrived at and expressed as to what should be done?—if any, what?"

Ans. "My brother requested my father to go on and get the money, as Mr. Bell proposed, and that he would attend to making the payments the same as if the deed should be taken in his own name; and the purchase was completed and the deeds were taken with that understanding, that my father should act as the agent of my brother in doing the business."

Int. 39. "You say, in your last answer, that James requested your father to go on and get the money in the manner Mr. Bell proposed. What, if anything, did your father say in reply?"

Ans. "He said that in doing the business he didn't want anything to do with the property, nor any trouble in looking after the payments for the same—that was the point that he wished distinctly to be understood; that he didn't want the property to be for himself, or to have the management of it in any way, as he had more business to attend to at that time than he could well do himself. He rented the home farm, to be clear from any trouble in the management of that, even."

Int. 40. "Did your father say anything as to deeding the property to James in the manner he said Mr. Bell had proposed, and if anything, what?"

Ans. "That, whenever my brother could raise the money to pay the mortgage to Mr. Bell, he would give him a deed of the property, and he might arrange the other claims in any way that he could do, either to let it remain or raise the money for the whole."

Int. 41. "Please state whether, in any of the conversations in regard to the purchase of the Samuel Ladd farm, there was any talk that you were to have an interest in the purchase, and if any, what."

*Ans.* "There was no mention made that I was to have any interest in the property. I was not to have any, neither did I want any."

Int. 42. "Please state whether, in any of the conversations between yourself and brother and father about the purchase of the Samuel Ladd farm, there was anything as to the purpose or object for which it was to be purchased, and if anything, what."

*Ans.* "In all conversations in regard to the purchase of the farm, my brother wished to obtain the place for himself, to be his own when paid for. The purchase was made by my brother. The bargain was made by him with Mr. Ladd for the purchase."

Int. 43. "Please state whether, in any of these conversations, there was anything said about its being bought as an addition to the home farm, or as to uniting the two farms into one, and if anything, what."

*Ans.* "There was no mention made as to its being added to the home farm, but it was expressly stated that it was to be a separate property for my brother, and no account to be rendered by him to my father in any way, in distinction from the farm that was rented."

Ints. 40, 41, and 43 were objected to at the caption, and also at the trial, as leading.

Ints. 221, 222, and 223, of the same deposition, were objected to as leading, both at the caption and trial; and Ints. 222 and 223 were further objected to as incompetent, as being in the nature of cross-examination, viz.,—

Int. 221. "Since the visit of your brother to you in Canada, as above stated, has the subject of the purchase of the Ladd farm and the attending circumstances been much or little in your mind, and how much or little?"

*Ans.* "I have given the subject a great deal of thought and attention, both as to the purchase and the circumstances relating to it."

Int. 222. "Is your recollection of the interview at Mr. Bell's office, which you have testified to, when the application was made for the money, distinct or indistinct?—how distinct or indistinct?"

*Ans.* "I recollect very clearly the conversation had at that time."

Int. 223. "What is your recollection of the conversation between your father and James and all three of you after the return by your father from receiving Mr. Bell's answer which you have before testified to,—distinct or indistinct? and how distinct or indistinct?"

*Ans.* "I recollect it distinctly, as I have stated it in my deposition."

The above was admitted, subject to exception.

7. *Matilda Whipple's* deposition. Ints. and answers as follows:

1. "When were you married?"

*Ans.* "The last day of September, 1841."

2. "Did you keep house when you were first married, and if not, how soon did you go to keeping house, and when, and how long did you live there?"

*Ans.* "We lived at father Woodward's house the winter after we were married, and I think it was in the spring of the next year that we moved into James Woodward's house, and we lived there eight years."

3. " How did you know it was James Woodward's house ? "

*Ans.* " Because my husband said it was. Well, I don't know as I had any other knowledge at the time we moved in, but afterwards I heard him very often speak of it as James's house, and James used to come into and give directions about the work and about his house."

4. " Do you know to whom your husband paid rent for the house ? "

*Ans.* "James Woodward."

5. " Did you know of any application to your husband to come into the house ? and if yea, state the circumstances."

*Ans.* " His brother wanted to come in, and he told him that we were willing if James was; that he would have to see him first."

6. " How long was this after you moved in, if you remember ? "

*Ans.* " They came in in the fall, and I should think it might be two or three months after we moved in."

8. " Please state whether he [Joshua Woodward] said or did anything concerning the place [that season], and if anything, what. "

*Ans.* " No, not anything about the place, except he would ask my husband what James was going to do about the place, or what he was going to do the next day : never gave any directions or spoke of it as if it was his."

The answers to Ints. 2, 3, and 8 were admitted, subject to exception.

All the foregoing evidence was objected to by the defendants as being mere hearsay, and wholly irrelevant to the question at issue ; and the declarations of Joshua Woodward, as testified to by Matilda Whipple and Benjamin Warren, were objected to specifically as having been made subsequent to his execution of the mortgage deed of February 28, 1842, and all of his said declarations were objected to upon the ground that the plaintiff not only did not admit, but denied that he was in possession of the Ladd farm at the time they were made.

Int. 29 and answer, upon cross-examination, in said Matilda's deposition, were as follows :

" Do you now, or did you at the time you lived in the Ladd house, know which land was the Ward farm and which was the Ladd farm ? "

*Ans.* " I don't know as I can answer that. [I supposed the land connected with the house we lived in was James's farm ; but] I don't know the land, or how it was set off."

The defendants objected at the caption, and also at the trial, to that part of the answer enclosed in brackets as not being responsive to the question, and as incompetent ; but the court ruled that the defendants might read the whole answer, or none of it, at their election. Mr. Carpenter thereupon read the whole answer, and excepted to the ruling.

The plaintiff offered in evidence a lease, from one Hannah Dow to said Joshua, of the Dow farm, so called, in said Haverhill, for a term of five years, commencing in 1838, to which the defendants objected ; but the court admitted it, as tending to confirm the position of the plaintiff,—that said Joshua was not carrying on the Ladd farm February 28, 1842,—and the defendants excepted.

James Woodward was permitted to testify, against the defendants'

objection, that he claimed to own the Ladd farm in 1841 and 1842 [and that his father held the legal title in these years] ;—to the part in brackets the defendants objected as being secondary ;—that he [James] agreed at the time the Ladd farm was bought to pay the Bell and Goss mortgages, and that his father agreed to convey the farm to him as soon as he [James] should pay said Bell mortgage ; that his father said, after he returned from Boston (about June 9, 1843), that he paid the Bell mortgage with the pension money which he obtained for Mrs. Mary Hale while he was gone ; that the loan from Bell (of November 23, 1840) was temporary only, and that his father agreed to pay Bell nine per cent. interest.

It appeared that said James never had any interview with Bell on the subject, and no knowledge except what his father had told him. To all which the defendants excepted.

The defendants offered the deposition of Martha H. Goss (owner of the Goss mortgage), containing the follow interrogatories and answers, viz. :

Int. 11. "Did you ever hear that James Woodward had anything to do with it ?—if so, when did you first hear of it ? "

*Ans.* " I don't know as I heard anything until the last winter." (Excluded against the defendants' objection.)

Int. 12. "What did you hear this last winter, and from whom ? "

*Ans.* " I heard that James Woodward paid it, and that his father [Joshua Woodward] acted as his agent. I heard this from Mrs. James Woodward."

Int. 13. " In what way did you hear this from Mrs. James Woodward ? "

*Ans.* " From her own pen."

Int. 14. " Have you a letter from Mrs. James Woodward containing this statement ?—if so, will you annex it, or a copy, to this deposition ? "

*Ans.* " I think my word should be taken for that. I did have a letter from Mrs. James Woodward, dated December 6, 1869, a copy of which is appended to this deposition, and by the Master marked 'A.' "

Int. 15. " Did you reply to this letter, and if so, have you a copy of that reply, or do you know where that reply is now ? "

*Ans.* " I did reply to it, but have no copy of it, and I do not know where that reply is now."

Int. 16. "What were the contents of that reply, and what were your answers to the several inquiries made by Mrs. James Woodward in her letter ? "

*Ans.* " I think I replied that Joshua Woodward paid me the interest on the note, and that I had no business with any other one. That was the amount of it. I don't remember any more."

Int. 17. " In stating in that letter to Mrs. James Woodward that Joshua Woodward paid you the interest on the note, and that you had no business with any other one, did you not then state the fact as you then remembered it ? "

*Ans.* " Yes, sir."

Int. 18. " Do you remember it in the same way now, or otherwise ? "

*Ans.* " I supposed then that I had only a note for the meadow land : I had forgotten then that I had his note for the place. I supposed it was my brother's note for the land. Since then I have seen evidence, that I feel the note was Joshua Woodward's. I have had my recollection refreshed since then, and know more of it now,—together with a copy of the letter therein referred to, as follows :

" 'A.' Copy.

" '*Haverhill, December* 6, 1869.

" 'Dear Madam : My husband wishes me to make some inquiries about a note his father gave you when he bought the place that was your father's. Did you understand that Joshua Woodward was making the purchase of the place for his son, or for himself ? Who paid the interest on your note ? My husband paid it, and would like to know if you remember about it, or understood from his father anything about it. He wishes to show to the court his indisputable title, as well as to show that he paid for it himself ; that his father only transacted his business as any agent would.          LOUISA  WOODWARD.' "

To which the plaintiff objected, and the same were excluded, and the defendants excepted.

The defendants offered the deposition of *Jonathan A. Ladd.* The plaintiff objected to certain portions of the deposition, especially to part of Int. 11. The whole was admitted, against his objection, and thereupon the court revised various rulings that had been made upon the plaintiff's depositions, admitting those numbers inclosed in brackets in the statement above given,—those questions and answers having been previously excluded or held under advisement.

The plaintiff started out with a claim that the transactions attending the purchase of the Ladd farm, in 1840, and the payment of the purchase-money, were such as to raise a resulting trust in favor of James Woodward, notwithstanding the business was done by his father, Joshua, in his own name, and the deed taken running to Joshua. After the depositions had been read, and all the rulings thereon made, the plaintiff withdrew this claim ; but the jury were nevertheless directed that they might consider all the evidence thus admitted, upon the question whether the Ladd farm was covered by the description in the mortgage of February 28, 1842, from Joshua to Bell,—that is, to show how it was, in fact, treated and managed by the parties. The defendants excepted.

There was much evidence as to how the Ladd farm was carried on in 1842, as well as a year or two before and after.

The plaintiff's evidence tended to show that, in 1842, James Woodward hired of his father the Ward farm, on which stood the house in which his father lived, at a stipulated rent, and carried on both the Ward farm and the Ladd farm together (the two lying side by side) ; that he occupied the Ladd farm as owner, paying no rent, while he carried on the Ward farm as tenant to Joshua.

Without objection, James Woodward testified : "I carried on the home farm, in 1843, on the same terms as before. I was to pay the taxes in 1843." The plaintiff introduced the invoice book of Haverhill, and showed thereby, without objection, that James Woodward was assessed, in 1841 and 1842, for "the Homestead farm, the S. Ladd farm, and the Sweatland farm." Against the defendants' objection, the plaintiff was permitted to show, in the same way, that James Woodward was assessed for the same parcels of land in 1843.

Against the defendants' objection, the plaintiff was permitted to ask James Woodward, on the stand, "How was it, during this time [the time from the purchase of the Samuel Ladd farm—1840—to the mortgage to Bell—1842], about your father making any claim to the place ?"

*Ans.* " He made no claim."

" Who was claiming to be the owner ? "

*Ans.* " I claimed to own it."

Subject to the defendants' objection, the plaintiff introduced a mortgage of the Ladd farm, from Joshua Woodward and wife to Philip Goss and wife, dated November 23, 1840.

Without objection, a mortgage of the Ladd farm to Joseph Bell, of the same date, was introduced ; and there was evidence tending to show that said Ladd farm was paid for with money procured on these two mortgages, and a horse which before that time had been the property of Joshua Woodward.

Subject to the defendants' exception, James Woodward was permitted to testify for the plaintiff, that he paid the interest on the Goss note for several years after it was made ; that the Goss debt, finally, went into the hands of Phineas Spaulding, and that he, after that, paid the interest thereon to said Spaulding.

There was evidence tending to show that the money to pay off the mortgage to Bell, of November 23, 1840, was obtained of Mary Hale upon the mortgage of June 9, 1843, the money having been procured for her about that time by Joshua Woodward, upon a pension claim.

Subject to the defendants' exception, the plaintiff was permitted to ask James Woodward,—"When you executed the mortgage to Spaulding, did you, or not, know of any claim being set up to the farm by Mr. Bell ?"

*Ans.* " I had no knowledge of any claim on the place down to that time."

Also, "What did you do with the money you had of Dr. Spaulding ? "

*Ans.* " I paid it to Mrs. Hale, in discharge of her claim upon the land."

Down to this point in the trial, the plaintiff had claimed that he was in the position of an equitable assignee of the mortgage of November 23, 1840—from Joshua Woodward to Bell—his grantor having furnished the money with which it was paid ; and the rulings were made with said claim in view, so far as they may have been affected thereby.

Here a discussion arose as to a mortgagee in possession being liable to account for rents and profits, on a writ of entry by him to recover the mortgaged premises. The court ruled that, " so far as regards the plaintiff's title depending on the first Bell mortgage, the defendants may plead, if necessary, and prove that James Woodward and those having his right have taken rents and profits equal in amount to the amount of that mortgage, so that said mortgage is cancelled ; " and stated that it would be submitted to the jury to find, specially, the amount of such rents and profits ;—and thereupon the plaintiff withdrew the claim of title by virtue of said mortgage.

The defendants' counsel, in his opening statement to the jury, claimed that Mr. Bell had no knowledge of the deed, from Joshua Woodward to James Woodward, of June 9, 1843. Against the defendants' objection, the court permitted the plaintiff to show that Charles E. Thompson, who resided at Haverhill in 1843–1845 and married a sister of Mrs. Bell, attended to business for him at Haverhill.

It was also urged by the defendants, in opening, that, from the condition and value of Joshua Woodward's property and the incumbrances upon it, it was improbable that Mr. Bell would have taken the mortgage of February 28, 1842, as security for a large debt, unless it was understood that the Ladd farm was included. Against the defendants' objection, the court permitted the plaintiff to introduce evidence of the consideration for which that mortgage was given, and that no money was obtained on it.

The defendants requested the court to instruct the jury that the record of the deed—Joshua Woodward to James Woodward, dated June 9, 1843—was no evidence of actual notice to Bell of the existence of that deed.

The court did not so instruct the jury, but did instruct them, in substance, that said record was not conclusive evidence of such notice, but that they might consider it in connection with all the facts in the case upon the question whether Bell, in fact, knew of the existence of said deed when he took the mortgage of September 4, 1844. The defendants also requested the court to charge, that the description of the premises conveyed by the mortgage of September 4, 1844, is not evidence upon the question at issue, unless the jury are satisfied that Bell, at the time he took the mortgage, had notice of the deed—Joshua to James—of June 9, 1843. This was refused, and the defendants excepted.

The defendants also requested the court to charge, that, as the case now stands, there is no evidence competent for the jury to consider tending to show that James Woodward had any title to or ownership in the Ladd farm prior to June 9, 1843 ; that there is no evidence in the case tending to show that any one except Joshua Woodward was either the legal or equitable owner of the Ladd farm after the date of Samuel Ladd's deed to said Joshua, and prior to June 9, 1843.

But the court declined to give this instruction, on the ground that it was not germane to the question finally sent to the jury, and not called

for by the facts appearing in the case. But the court did give instructions, to which no exception was taken, as to the bearing of the evidence, which the plaintiff had claimed in the early part of this trial tended to show a resulting trust in James Woodward, upon the question of what was intended to be conveyed by the mortgage of February 28, 1842, from Joshua to Bell.

In the mortgage of September 4, 1844, the description of the premises is as follows : " All the farm in said Haverhill, lying on both sides of Ladd street, so called, which I now live on, estimated at 150 acres more or less ; also the Sweatland farm, so called, in said Haverhill, being all the 100 acre lot, No. 11, west of the road through the same, in the first division of lots in said Haverhill, being the same land described in my mortgage deed to said Bell, dated February 28, 1842, and recorded in the Grafton Registry, lib. 168, fol. 136."

The jury returned a verdict for the plaintiff, which the defendants moved to set aside, and for a new trial for supposed error in the foregoing rulings.

Case reserved for the law term of the late supreme judicial court by LADD, J.

*C. R. Morrison* and *E. D. Rand*, for the plaintiff.

*Carpenter* and *Bingham*, for the defendants.

SMITH, J.  Upon the trial the plaintiff claimed that at the time of the purchase of the Ladd farm there was a resulting trust in favor of James Woodward.  He further claimed that James Woodward became the equitable assignee of the mortgage of November 23, 1840, from Joshua Woodward to Joseph Bell, and that the plaintiff, as his legal representative, succeeded him in that capacity.  He, however, abandoned both of these positions during the trial.  He thereby conceded that Joshua Woodward was the equitable as well as legal owner of the Ladd farm on February 28, 1842, when he mortgaged his farm to Joseph Bell.  The description in the mortgage reads thus : " All the farm in said Haverhill, lying on both sides of Ladd street, so called, on which I now live and which I now carry on, estimated at 150 acres more or less."  The plaintiff contends that by this description is included the Ward farm and outlying lands, but not the Ladd farm.  The defendants contend that the mortgage includes the Ladd farm and Ward farm.  The main question, therefore, in this case, is, whether the mortgage includes the Ladd farm ; and hence it becomes material to inquire how and by whom it was occupied and carried on at that time.  We will consider the exceptions in the order in which they are named in the reserved case.

After the plaintiff withdrew his claim that there was a resulting trust in favor of James Woodward, the jury were instructed that they might consider all the evidence thus admitted upon the question whether the Ladd farm was covered by the description in the mortgage

to Bell,—that is, to show how it was in fact treated and managed by the parties. The point to be determined was, whether the Ladd farm was described in the mortgage of 1842 from Joshua Woodward to Joseph Bell. It is not necessary to inquire whether Joshua owned the property or not. If it was described in his deed to Bell, then James Woodward, claiming under a later deed from Joshua, would have been estopped by his grantor's covenants of warranty; so that the real and only question is, whether the Ladd farm was in 1842 in the possession of Joshua;—did he then live on it and carry it on? If he did any acts of carrying on, his declarations accompanying those acts would be evidence tending to show whether he was really carrying it on, or working for somebody else.

In *Bell* v. *Woodward*, 46 N. H. 315, 335, a familiar rule in the interpretation of deeds was laid down in the following language: " Courts will call to their aid *acts* done under the deed as a *clue* to the intention of the parties. So the acts of the party may be shown through whom title is claimed. No reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the claimant's title, or otherwise qualifying his possession, if made in good faith, should not be received as part of the *res gestæ*, leaving its effect to be governed by other rules of evidence." " Under the aforesaid rules, evidence of the acts and declarations of Joshua and James Woodward, tending to show the character of their occupation, and especially when tending to show whether or not the premises were used and treated as part of the Ward farm, or Ladd farm, or otherwise, becomes competent as part of the *res gestæ*. So it is important to know how these farms were carried on, and how used. As the occupation upon the evidence was equivocal, evidence of the claims of James and Joshua becomes competent, as tending to show the character of the acts of each, whether acts of occupancy for himself or the other. The acts and declarations of tenants of the like character are to the same extent competent. The declarations of a party in possession of lands, as to the nature of his possession, may be given in evidence against all persons claiming under him."

The testimony introduced by the plaintiff, in this case, upon the claim of a resulting trust, consisted of the declarations of Joshua and James,—that the latter was in the possession or occupancy of the Ladd farm as owner,—and the statements of Joshua, to the effect that he bought the property for James. The case shows that the declarations of Joshua were admitted, " the plaintiff not admitting, but, on the contrary, denying, that Joshua was in the possession of the premises at the time." It is objected by the defendants that his declarations were not competent as being a part of the *res gestæ*. " The *res* is wanting. The very question in issue is, whether Joshua, in fact, lived upon—was in possession of—the farm ; and upon that question, his declarations, one way or the other, are mere naked hearsay. None of the declarations accompanied any act done upon the farm. The existence of the *res* itself, of which the declarations are claimed to be a part, can neither

be proved nor disproved by the declarations themselves. Here the plaintiff puts in the declarations, not to prove, but to disprove, the existence of the only fact which could render them competent."

To this the plaintiff replies: "The defendants say the *res* is wanting. Not so: the *res* is the fact, which the defendants proved by Lyman Buck and other witnesses, that Joshua Woodward, after February 28, 1842, and even after September 4, 1844, was living in the town upon the Ward farm, and was seen at work at different times upon the Ladd place, and that the crops of both farms were put into the barn upon the Ward place. These facts—which the defendants themselves put in evidence—unexplained, would tend to show that during the time to which they relate Joshua Woodward was living upon and carrying on both farms. If, in whatever he did upon the Ladd farm, he was at work for *himself as owner*, his acts of cultivation and management so far constituted an occupation by himself, and *he*, so far, was carrying on the farm ; while, on the other hand, if in whatever he did upon the Ladd farm he was not *claiming for himself*, but at work for *James*, his acts were, in a legal sense, the acts of James, and *James* was " carrying on " the farm not less when Joshua was at work than at other times. In this state of the case, *any* declarations of Joshua, whatever may be the particular language used showing the *character* of his acts of occupation, whether for himself or otherwise, are most clearly competent. The fact that the legal title was in Joshua Woodward does not necessarily prove that Joshua was either " living on or carrying on " the Ladd farm. He might hold the legal title to the farm without living on it : he might hold the legal title without carrying it on : he might hold the legal title without claiming any beneficial interest : it is perfectly obvious that he might hold the legal title and yet James be " carrying on " the farm, as owner—that is, as *beneficial* owner—and Joshua be at work for him, more or less, at different times ;— and Joshua Woodward's declarations, during that period covered by the defendants' evidence, showing whether he was there *as* owner and *for himself*, or otherwise, must be competent, if the defendants' evidence was properly admitted, and they are in no position to say it was not."

The legal ownership of the farm was conceded by the plaintiff, on the trial, to be in Joshua Woodward ; but the question of ownership, though not in controversy, had a direct bearing upon the question of occupation, which was the principal question tried. It was not claimed that Joshua Woodward ever lived upon the Ladd farm, so that the question whether he carried it on in 1842 was a vital question to both parties. The declarations of James Woodward, that he claimed to own the premises, have a direct tendency to show that he was occupying them on his own account, and not as agent or tenant under Joshua Woodward. *Marcy* v. *Stone*, 8 Cush. 4. And the declarations of the latter, that he had nothing to do about the Ladd farm, and that he did not own it, but that it belonged to James, had the same tendency to prove that the latter was occupying for himself and not on account of the former; and being the declarations of a deceased person, under whom the

defendants derive their title to the premises in dispute respecting the boundaries of the land described in the mortgage to Bell, are admissible against the defendants' claiming under him. *Pike* v. *Hayes*, 14 N. H. 19. The same is also true of the declarations of the tenants of the Ladd farm, as to whom they claimed to hold under. The declarations of a tenant in possession are competent not only to rebut a title, set up by or under the party who made them, but are affirmative evidence of title in the party for whom the person in possession declared that he held it. *So. Hampton* v. *Fowler*, 54 N. H. 197.

The evidence, that James Woodward was assessed for the Ladd farm in 1843, was an act of ownership, to be weighed by the jury. *Hodgdon* v. *Shannon*, 44 N. H. 576. It was evidence of a continuous claim by James Woodward. The plaintiff claimed that James was, and Joshua was not, in the occupation of the Ladd farm in February, 1842, and, to support this claim, he introduced James as a witness, whose testimony tended to show that he was in occupation of that farm in the years 1841, 1842, and 1843, under an agreement to pay the taxes thereon. Although the assessment of 1843 was after the date of the Bell mortgage, it had some tendency to show the character of the occupation of the farm before that date by James, and that his occupation was continuous.

No exception lies to the introduction of the Goss mortgage, or to the evidence that James Woodward paid the interest upon it for several years. In *Bell* v. *Woodward*, 34 N. H. 90, it was held that James Woodward became subrogated to the rights of the mortgagee under that mortgage as against Bell. The evidence was also competent as showing the character of his occupation, and that his claim was continuous.

The defendant claimed in his opening statement to the jury that Mr. Bell had no knowledge of the existence of the deed from Joshua Woodward to James Woodward. To rebut this, it was competent for the plaintiff to show that his brother-in-law [Thompson] resided in Haverhill, and tended to business there for him, where the record was. How much weight was to be given to this evidence was another question, and was for the jury to determine. It might be much or little, or possibly none at all, but it was a circumstance which the plaintiff had a right to have weighed.

It was also competent for the plaintiff to show that no money was obtained upon the mortgage of February, 1842, to rebut the statement made by the defendants' counsel in his opening, that from the condition and value of Joshua Woodward's property, and the incumbrances upon it, it was improbable that Mr. Bell would have taken the mortgage of February, 1842, as security for a large debt, unless it was understood that the Ladd farm was included.

The instructions to the jury, in regard to how far the record of the deed from Joshua Woodward to James Woodward was notice to Mr. Bell of the existence of that deed, were correct, and the instructions requested were properly refused. The record, if not conclusive evidence of notice to Bell, was certainly to be weighed with the other evidence

in the case in determining the question whether he knew of the existence of this deed when he took the mortgage of September 4, 1844. If the jury should find that Joshua Woodward was not in the occupation of the Ladd farm in September, 1844, and that Mr. Bell, when he wrote and took the mortgage of that date, knew of the existence of the deed from Joshua to James, it is evidence of an admission that Joshua did not live upon nor carry on the Ladd farm in February, 1842, and would be strong evidence that that farm was not included in the mortgage to him of the date last mentioned. The instructions upon this point were sufficient, and, therefore, the court properly refused to instruct the jury as requested, that the description of the premises conveyed by the mortgage of September 4, 1844, was not evidence upon the question at issue, unless the jury were satisfied that Bell at the time he took the mortgage had notice of the deed—from Joshua Woodward to James Woodward—of June 9, 1843. The jury were told that the record was to be weighed with the other facts in the case, but was not conclusive evidence. If, therefore, they found that Mr. Bell had no notice of the record, or had not such notice from the facts of the case and circumstances of the parties, including their acts, as to put him upon inquiry, then the description in the last mortgage was not evidence upon the question at issue. The least that can be said of the instructions is, that they were sufficiently favorable to the defendants.

The court, also, properly refused to grant the defendants' last request for instructions, that there was no evidence competent for the jury to consider tending to show that James Woodward had any title to or ownership in the Ladd farm prior to June 9, 1843, and that there was no evidence tending to show that any one except Joshua Woodward was either the legal or equitable owner of the Ladd farm after the date of Samuel Ladd's deed to him, and prior to June 9, 1843. The refusal was very properly put, upon the ground that the instruction was not germane to the question finally sent to the jury, and was not called for by the facts appearing in the case. As before remarked, the question of title to the Ladd farm was not in dispute. The plaintiff conceded that both the legal and equitable title was in Joshua Woodward. But it was material how the parties understood the title to be, upon the question of occupation, and as showing the character of the possession by either of them; and, as no exception was taken to the instructions given as to the bearing of the evidence, which had been introduced to show a resulting trust in James Woodward, upon the question of what was intended to be conveyed by the mortgage of February 28, 1842, there is no occasion to examine further that question.

The defendants also excepted to the admission in evidence of the declarations of Joshua and James Woodward, as to the ownership of the Ladd farm subsequent to February 28, 1842. If the jury found that Mr. Bell, at the time he took the mortgage of September 4, 1844, had notice of the deed, from Joshua to James Woodward, of June 9, 1843, any evidence as to the possession of the Ladd farm prior to the execution of the second mortgage would be material, because in the

last mortgage the premises are declared to be the same as those described in the first. The case also finds that the defendants introduced the deposition of Lyman Buck, who testified as to the manner in which the Ladd farm was carried on after February 28, 1842. As before remarked, the character of the occupation after February 28, 1842, had some tendency to show its character and legal effect on that day, and the defendants having introduced evidence in relation to the occupancy subsequent to that date, it was competent for the plaintiff to rebut it by introducing other evidence to the same point. Counsel for the plaintiff well says,—" The facts were continuous in their nature ; and evidence of the character of the occupation, after ·February 28, 1842, would tend to explain the occupation before that time, just as, upon a question of a fraudulent sale, the inquiry is not restricted to transactions prior to the principal fact."

The lease from Dow to Joshua Woodward had some tendency to confirm the position of the plaintiff, that Joshua was not carrying on the Ladd farm February 28, 1842, and was, therefore, properly admitted ; but, if it had no such tendency, the most that can be said of it is, that the evidence was immaterial, and was not calculated to prejudice the jury against the defendants.

The testimony of Eliza Poole was competent—at least, for the purpose of contradicting Arnold Ladd. Ladd had testified that the farm was bought for Joshua. Mrs. Poole's testimony contradicts Ladd, and tends to show that it was bought for James.

Certain interrogatories were objected to as being leading. Whether they should be put, notwithstanding, was a question addressed to the discretion of the judge who presided at the trial, and that question was not sent up by him, and is not now open to consideration.

The examination-in-chief of J. B. F. Woodward did not go beyond 1842. Upon cross-examination, he was examined as to the occupation and history of the two farms subsequent to that date. Cross-interrogatory 92, which was objected to, refers to Int. 19 in chief. Int. 96 shows that the witness received his information from Joshua Woodward, and that makes his answer to Int. 92 competent.

The letter of Mrs. Woodward to Mrs. Goss was properly excluded, being irrelevant. It is *res inter alios.* James Woodward does not appear to have had anything to do with it, and it in no way contradicts him. Mrs. Goss's answer to the 11th interrogatory in her deposition was also properly excluded. It appears that she learned the fact inquired about more than 25 years subsequent to the time when it is claimed to have transpired. That she did not learn of it sooner has no tendency to prove that the fact was otherwise. Whether she would have been likely to have heard it contemporaneously with the event depends on so many contingencies, that the fact that she did not furnishes no ground from which the jury could find that the information was untrue. Further, the testimony in no way contradicted Mrs. Woodward.

CUSHING, C. J., and STANLEY, J., C. C., concurred.

*Exceptions overruled, and judgment on the verdict.*